UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 19-20852-CIV-MORENO**

JOHN MARK JONES,

        Plaintiff,

vs.

UNITED STATES OF AMERICA;
SPECIAL AGENT LUIS ARIAS,
individually; and
SPECIAL AGENT JASON SCELSA
*a/k/a* JASON WILSON, individually,

        Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION TO DISMISS

In this excessive force case, Plaintiff John Mark Jones, a Sergeant with the Monroe County

Sheriff's Office, alleges that his Fourth Amendment rights were violated by federal agents of the

Bureau of Alcohol, Tobacco, Firearms and Explosives because they used excessive force against

him during an investigatory stop. In his Amended Complaint, Jones asserts 6 excessive force

claims under *Bivens* and Section 1983 against ATF Agents Luis Arias and Jason Scelsa, and 4

claims against the United States under the Federal Tort Claims Act for negligence, assault, battery,

and false imprisonment.

Defendants move to dismiss all claims. They argue that the allegations fail to state any

claims against the United States, and that the Agents are immune from suit on qualified immunity

grounds. Jones insists that his claims are adequately pleaded and that qualified immunity is not

appropriate here.

For the reasons below, the Defendants' Motion to Dismiss **(D.E. 26)** is **GRANTED IN
PART AND DENIED IN PART**.

## I.  **FACTUAL BACKGROUND**[1]

In September 2017, Plaintiff John Mark Jones, a Sergeant with the Monroe County Sheriff's Office, was working alongside other law enforcement agencies to coordinate security and clean-up efforts in the Florida Keys following the devastation left by Hurricane Irma.  (D.E. 25 at ¶¶ 12, 14.)  While traveling on a two-lane highway on Sugarloaf Key, Jones approached two vehicles stopped in the road.  *Id.* at ¶¶ 16–20.  The vehicles, which were heading in opposition directions, were positioned mirror-to-mirror.  *Id.* at ¶¶ 19–20.  Unable to drive around the stopped vehicles, Jones honked his horn at the black Chevrolet Suburban stopped immediately in front of him.  *Id.* at ¶¶ 21–22.  Although the other vehicle moved, the driver of the Suburban "glanced" at Jones with an "irritated" and "angry" stare and refused to move his vehicle.  *Id.* at ¶ 23.  Left with no choice, Jones "was forced to proceed" around the Suburban.  *Id.* at ¶ 24.

Almost one mile down the highway, Jones noticed the Black Suburban traveling at a high rate of speed with his emergency lights and siren activated.  *Id.* at ¶ 25.  Jones "immediately pulled over" and "exited" his "unmarked" truck.  *Id.* at ¶¶ 16, 26.[2]  He then, "pursuant to policy and procedure," stated that he worked for the Sheriff's Office and asked why he was stopped.  *Id.* at ¶ 26.  The Suburban was occupied by Defendants Luis Arias and Jason Scelsa, both agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives.  *Id.* at ¶¶ 15, 27.  The Agents exited the Suburban.  And unlike Jones, who was wearing plain clothes,[3] both Agents wore tactical gear with "ATF" displayed on their vests.  *Id.* at ¶ 27.  Jones again shouted that he worked for the Sheriff's

---

[1] These facts come from the Amended Complaint and are presumed true for ruling on the motion to dismiss.  *Caravello v. Am. Airlines, Inc.*, 315 F. Supp. 2d 1346, 1348 (S.D. Fla. 2004).

[2] The unmarked truck was issued by the High Intensity Drug Trafficking Areas Program, of which Jones was a member.  This program aids federal, state, local, and tribal law enforcement agencies operating in critical drug-trafficking areas of the United States.  (D.E. 25 at ¶¶ 13, 16.)

[3] The Court reasonably infers this fact from Jones's other allegations that he was driving an "unmarked truck," that he needed his wallet to show the Agents that he worked for the Sheriff's Office, and that he repeatedly told the Agents during the encounter that he worked for the Sheriff's Office.

Office and announced that he was going to get his wallet. *Id.* at ¶ 28. It was then that Jones "wanted to reach for his wallet" but the driver[4] ordered Jones to stop and show his hands, and then warned Jones not to reach for anything or else he would be shot. *Id.* at ¶ 29.

Jones complied with the driver's order, again asserted that he worked for the Sheriff's Office, and again asked why he was stopped. *Id.* at ¶ 30. At this point, both Agents approached Jones with their guns drawn and pointed at his face. *Id.* at ¶ 32. The driver then "grabbed" Jones, directed him to the Suburban, and "slammed" him against the side fender and hood. *Id.* at ¶ 33. During this time, Jones continued to tell the Agents that he worked for the Sheriff's Office and told the Agents to check his wallet or truck. *Id.* Agent Arias continued to yell at Jones while Agent Scelsa continued to aim his gun at Jones's face. *Id.* at ¶ 34. Then, Agent Arias grabbed Jones's right arm and "forcefully pulled it behind his back and to the middle of his neck." *Id.* at ¶ 35. Jones immediately felt pain and his shoulder muscle and tendons tear. *Id.* It was not until after this injury that the Agents checked Jones's law enforcement credentials. *Id.* at ¶ 36.

The Agents considered bringing in and arresting Jones, yet, despite Jones's repeated questions, refused to tell him why he was stopped. *Id.* at ¶ 37. Jones "requested to leave" but the Agents "refused and held" him "against his will." *Id.* at ¶ 38. After Jones told the Agents that he was going to tell his Captain and the Sheriff about the incident, the Agents told Jones that they would be taking him to jail. *Id.* The Agents then started yelling obscenities louder and louder to the point where some local residents started observing the incident. *Id.* at ¶ 39. It was at this point that the Agents decided to let Jones go. *Id.* at ¶ 41. Jones asked why he was stopped one last time, and Agent Scelsa replied that he was stopped for speeding. *Id.* at ¶ 42. Jones alleges that "all parties know" that this is "a fabricated story . . . in an attempt to justify the stop." *Id.*

---

[4] At various points, the Amended Complaint refers to the Agents as the "driver" or "passenger" of the Suburban. This Section follows the Amended Complaint in this regard.

## II. **LEGAL STANDARD**

"A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. *Id.* at 679. Detailed factual allegations are not required, but the complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of the cause of action." *Twombly*, 550 U.S. at 555 (citation omitted). The factual allegations must be enough to "raise a right to relief above the speculative level." *Id.* (citations omitted). Finally, at the motion to dismiss stage, the Court must view the allegations in the complaint in the light most favorable to the plaintiff and accept well-pleaded facts as true. *See St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 954 (11th Cir. 1986).

## III. **DISCUSSION**

The Amended Complaint asserts 4 claims against the United States under the Federal Tort Claims Act for negligence (Count 1), assault (Count 2), battery (Count 3), and false imprisonment (Count 4). And against the Agents, the Amended Complaint asserts 3 claims under *Bivens* (Counts 5–6 and 9) and 3 claims under Section 1983 (Counts 7–8 and 10) for excessive force. Defendants move to dismiss all claims. Jones insists that all his claims survive as pleaded.

## A.  **CLAIMS AGAINST THE UNITED STATES**

The Federal Tort Claims Act demands that federal courts apply the law of the situs state to determine whether a tort claim has been stated.  *See Gomez v. United States*, 601 F. App'x 841, 851 (11th Cir. 2015) (citing 28 U.S.C. § 1346(b)(1)).  The events in this lawsuit occurred in Monroe County, Florida, and thus Florida law applies to Jones's claims under the Act.

### 1.  **Negligence (Count 1)**

To state a negligence claim under Florida law, Jones must allege that the United States owed him a duty of care, that the United States breached that duty, that the breach injured him, and that he is entitled to damages.  *See Miles v. Naval Aviation Museum Found., Inc.*, 289 F.3d 715, 722 (11th Cir. 2002) (citing *Ewing v. Sellinger*, 758 So. 2d 1196, 1197 (Fla. 4th DCA 2000)).

Previously, the Court dismissed Jones's negligence claim under the public duty doctrine. (*See* D.E. 20 at 2.)  This doctrine, recognized in *Trianon Park Condo. Ass'n, Inc. v. City of Hialeah*, generally provides that a government entity's exercise of discretionary power to enforce the law is a matter of governance for which there has never been a common law duty of care.  468 So. 2d 912, 919 (Fla. 1985).  This time, Jones seeks to avoid dismissal under the *Trianon* public-duty doctrine by alleging that the United States owed him a "special duty."  A special duty arises when law enforcement officers become directly involved in circumstances that place people within a "zone of risk" by creating or permitting dangers to exist, by taking persons into police custody, detaining them, or otherwise subjecting them to danger.  *See Wallace v. Dean*, 3 So. 3d 1035, 1048 (Fla. 2009) (citing *Pollock v. Fla. Dept. of Highway Patrol*, 882 So. 2d 928, 935 (Fla. 2004)).

In the Amended Complaint, Jones alleges that the United States undertook a "special duty" based on a "'special relationship' with other law enforcement entities": (1) to ensure that various government agents could carry out their assistance in the cleanup of the Florida Keys following

Hurricane Irma in a professional and safe manner; and (2) to not increase harm and to eliminate any risk and harm to other law enforcement members. (*See* D.E. 25 at ¶¶ 45, 48.) Jones further alleges that the United States breached these duties by, among other reasons, failing to ensure that the Agents were aware of their specific duties and responsibilities while assisting other law enforcement members and by inflicting excessive, objectively unreasonable and unwarranted unconstitutional force upon Jones. *Id.* at ¶¶ 50(b), (d).

The United States argues that there is no support for the concept of a special duty between law enforcement and agents helping to protect public safety during a natural disaster emergency. Urging otherwise, Jones cites three Florida Supreme Court cases that applied the "special duty" exception to the public-duty doctrine. But contrary to Jones's assertion, there is no support in *Wallace*, *Henderson*, or *Kaisner* for a special duty between law enforcement agencies or agents: the Florida Supreme Court in each case found that law enforcement owed a duty to individual *members of the public* to protect them from dangers that were created or permitted to exist because they were detained by officers, or as a result of officers responding to a 911 call. *See Wallace*, 3 So. 3d at 1043, 1052 (ruling officers had a duty under the undertaker doctrine because, in responding to a 911 call involving a non-responsive person, the officers increased the risk of harm by affirmatively undertaking to provide aid but then repeatedly made assurances to third parties that emergency help was not immediately required); *Henderson v. Bowden*, 737 So. 2d 532, 534, 537 (Fla. 1999) (ruling officers had a duty to reasonably safeguard the well-being of a vehicle's passengers after stopping and arresting the intoxicated driver of the vehicle and then directing one of the passengers to drive the vehicle to a nearby gas station); *Kaisner v. Kolb*, 543 So. 2d 732, 733–34 (Fla. 1989) (ruling officer had a duty to reasonably safeguard the well-being of a man and his family from onrushing traffic during a traffic stop). And in any event, the risks created by the

officers in these cases are not present here: Jones's injuries were the direct result of force used to effectuate a stop, whereas the victims in these cases were placed within a "zone of risk" that was affirmatively created or permitted to exist by law enforcement. *See Wallace*, 3 So. 3d at 1043, 1052 (unresponsive person died after officers repeatedly made assurances that emergency help was not immediately required); *Henderson*, 737 So. 2d at 534, 537 (passengers in vehicle died after the former-passenger who drove the vehicle to the nearby gas station, with the officer's permission, subsequently left the gas station and collided with a cluster of trees); *Kaisner*, 543 So. 2d at 733–34 (driver of stopped vehicle was struck by the police cruiser after another vehicle from onrushing traffic unexpectedly struck the police cruiser from behind).

Aside from these cases, Jones does not cite any other authority to support his theory of a special duty owed between law enforcement agencies or agents.   And the Court is not independently aware of any such special duty under Florida law.  Therefore, Jones cannot state a negligence claim based on his special duty theory.  Count 1 is thus **DISMISSED**.

### 2.  **False Imprisonment (Count 4)**

To state a false imprisonment claim under Florida law, Jones must allege that he was (1) unlawfully detained and deprived of his liberty, (2) against his will, (3) without legal authority or "color of authority," and (4) that the deprivation of liberty was unreasonable under the circumstances. *Harder v. Edwards*, 174 So. 3d 524, 530 (Fla. 4th DCA 2015) (citations omitted).[5]

Previously, the Court dismissed Jones's false imprisonment claim because he alleged that he "was subjected to a brief investigative stop" and because he did not allege that "the restraint was unreasonable and unwarranted under the circumstances." (D.E. 20 at 3.)  After reviewing the

---

[5] As a conceptual matter, while false arrest and false imprisonment are closely related, false imprisonment is "a broader common law tort" and false arrest is "only one of several methods of committing false imprisonment." *Mathis v. Coats*, 24 So. 3d 1284, 1289 (Fla. 2d DCA 2010) (citations omitted).

Amended Complaint, the Court finds that these initial pleading deficiencies are cured.  In it, Jones alleges that the "'stop' was not a brief investigative stop" and that the restraint was unreasonable and unwarranted under the circumstances because he should never have been subjected to detention, yet the Agents—with "no authority to pull over [Jones] while providing aid to local authorities during a natural disaster"—"drew their service weapons" on him and pinned him against the hood of the Suburban, thus "forcibly restraining" him by force or threat of force. (D.E. 25 at ¶¶ 67–69.)  Jones also alleges that this force was used despite only being stopped for speeding. *Id.* at ¶ 42.

Notably, the United States does not take issue with the sufficiency of Jones's allegations. (*See* D.E. 26 at 12–14.)  Instead, the United States invokes an affirmative defense and argues that the false imprisonment claim must still be dismissed because the Agents had probable cause (or at least reasonable suspicion) to stop and detain Jones.  But the Court cannot determine from the face of the Amended Complaint that the Agents had probable cause or reasonable suspicion to stop Jones.  And thus, it is premature for the Court to decide at this time whether the stop was objectively reasonable under the circumstances. *See Amato v. Cardelle*, 56 F. Supp. 3d 1332, 1334 (S.D. Fla. 2014) (denying motion to dismiss false arrest claim because "probable cause is a question of fact that cannot be resolved on a motion to dismiss."); *Gregory v. Miami-Dade Cnty.*, 86 F. Supp. 3d 1333, 1338 (S.D. Fla. 2014) (denying motion to dismiss false imprisonment claim because the existence of probable cause could not be determined from the face of the complaint).

At the motion to dismiss stage, the Court's review is limited to the allegations in the Amended Complaint.  And as set out above, the Amended Complaint alleges that Jones was forcibly restrained against his will by the Agents, and that the non-brief stop, premised on a "fabricated story" of speeding, was unreasonable under the circumstances.   Taking these

allegations as true and drawing reasonable inferences from them, Jones states a claim for false imprisonment.  The motion to dismiss is accordingly **DENIED** as to Count 4.  At summary judgment, the United States may renew its probable cause defense with supporting evidence.

### 3.  Assault (Count 2) and Battery (Count 3)

Finally, Jones asserts claims against the United States for assault and battery.  But in this Circuit, "a claim that *any force in an illegal stop* . . . is excessive is *subsumed* in [an] illegal stop . . . claim and is *not* a discrete excessive force claim." *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) (emphases added) (citing *Williamson v. Mills*, 65 F.3d 155, 158–59 (11th Cir. 1995)).  This is because "if a stop or arrest is illegal, then there is no basis for any threat or any use of force . . . ." *Id.*

Following *Jackson* and *Williamson*, courts in this district have dismissed assault and battery claims that stem from the same factual allegations asserted in support of a false imprisonment or false arrest claim.  *See Gregory*, 86 F. Supp. 3d at 1339 (applying *Jackson* and granting motion to dismiss battery claim because "by operation of law" the claim was "subsumed within [the] claim for false imprisonment"); *Papa v. City of N. Miami Beach*, 2007 WL 9701041, at *4 (S.D. Fla. Apr. 2, 2007) (applying *Williamson* and granting motion to dismiss assault claim because "the correct analysis" is that the assault claim was "subsumed in the false imprisonment claim").  Thus, Counts 2 and 3 are **DISMISSED** as subsumed by the false imprisonment claim.

## B.   CLAIMS AGAINST THE AGENTS

The Amended Complaint asserts 6 excessive force claims against the Agents: 3 claims under *Bivens* and 3 claims under Section 1983.  At the outset, the Court notes that the 2 *Bivens* claims against Agent Scelsa (Counts 6 and 9) are duplicative of each other, as are the 2 Section 1983 claims against Arias (Counts 7 and 10).  Because the Court finds no discernable difference

between the allegations supporting these claims, and there is no argument from Jones to the contrary, Counts 9 and 10 are dismissed as duplicative in the interests of judicial economy. *See In re Takata Airbag Prods. Liab. Litig.*, — F. Supp. 3d —, 2020 WL 2892366, at *20 n.8 (S.D. Fla. June 1, 2020) (citing *Kuchenbecker v. Johnson & Johnson*, 2019 WL 4416079, at *2 (S.D. Fla. Sept. 16, 2019)). The Court will now address the remaining claims.

### 1. *Bivens* Claims (Counts 5–6)

Jones alleges that the Agents are liable under *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971) for violating his Fourth Amendment rights by unreasonably using excessive force. The Agents argue that these claims are barred because they are entitled to qualified immunity.

### a) Qualified Immunity at the Motion to Dismiss Stage

The qualified immunity defense may be raised in a motion to dismiss and will be granted if the complaint fails to allege the violation of a clearly established constitutional right. *Smith v. Siegelman*, 322 F.3d 1290, 1294 (11th Cir. 2003) (quoting *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001)). Qualified immunity balances two important public interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). This allows officials to work without fear of liability, protecting "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). So "unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of the discovery." *Diaz v. Miami-Dade Cnty.*, 424 F. Supp. 3d 1345, 1356 (S.D. Fla. 2019) (quoting *Lawson v. City of Miami Beach*, 908 F. Supp. 2d 1285, 1289 (S.D. Fla. 2012)).

### b) **Discretionary Function**

The qualified immunity defense shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Corbitt*, 929 F.3d at 1311 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To establish a qualified immunity defense, "the public official 'must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Acting within the scope of discretionary authority means that the actions were (1) undertaken pursuant to the performance of the officer's duties and (2) within the scope of the officer's authority. *See Collier v. Dickinson*, 477 F.3d 1306, 1307 n.1 (11th Cir. 2007) (quoting *Lenz v. Winburn*, 51 F.3d 1540, 1545 (11th Cir. 1995)).

Here, the Agents assert that they were in the Florida Keys performing a public security function while assisting other law enforcement agencies in the aftermath of Hurricane Irma. They argue that activating their emergency sirens and lights to stop Jones was an exercise of their public security function. This argument is not seriously contested by Jones: without more, he summarily asserts that he is "unwilling to concede that the actions of the Special Agents were discretionary." (D.E. 27 at 12.) This conclusory contention is not persuasive. And in any event, the Court finds that the stop was a discretionary exercise of the Agents's public security function. The burden now shifts back to Jones to show that his allegations establish that his Fourth Amendment rights were violated and that the unlawfulness of the Agents's conduct was clearly established at the time.

### c) **Constitutional Violation**

*Bivens* recognizes a cause of action for damages against federal officers based on constitutional violations. *See Smith*, 322 F.3d at 1297 n.15. And Jones's *Bivens* claim alleges that the Agents violated his Fourth Amendment rights by unreasonably using excessive force. The Fourth Amendment provides the "right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. The Fourth Amendment also "encompasses the right to be free from excessive force during the course of a criminal apprehension." *Corbitt*, 929 F.3d at 1315 (quoting *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009)). To establish a Fourth Amendment claim for excessive force, Jones must allege (1) that a seizure occurred and (2) that the force used to effect the seizure was unreasonable. *Id.* (quoting *Troupe v. Sarasota Cnty.*, 419 F.3d 1160, 1166 (11th Cir. 2005)).

### (1) The Seizure

There is no question here that the Agents seized Jones. A seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis in original). And here, Jones's arm was pinned behind his back and his body was pinned to the Agents's vehicle. The core issue in dispute, then, is whether this force was reasonable.

### (2) The Reasonableness of the Seizure

To determine whether force is excessive, the Supreme Court has directed courts to give "careful attention to the facts and circumstances of each particular case," including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

Because these so-called "*Graham* factors" serve only as a guide, it is not necessary for an officer to show that all three factors weigh in his or her favor to establish that the force used was reasonably proportionate to the need for the force. *Varnadore v. Merritt*, 778 F. App'x 808, 813–14 (11th Cir. 2019) (citing *Shaw v. City of Selma*, 884 F.3d 1093, 1098–100 & n.5 (11th Cir. 2018)).   In addition to the *Graham* factors, the Eleventh Circuit has added as important considerations "the relationship between the need and amount of force used" and "the extent of the injury inflicted." *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) (quoting *Vinyard*, 311 F.3d at 1347).   Although these standards do not establish a bright line, "qualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the officer's] position to conclude the force was unlawful." *Id.* (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994)).

### (i)  The *Graham* Factors

Jones argues that, under the *Graham* factors, the force used by the Agents was unreasonable under the circumstances.   Jones emphasizes that he was stopped for a minor, non-criminal offense (speeding), that he did not pose an immediate threat of safety to the Agents or the public because he is Sargent with the Sheriff's Office, and that he did not actively resist or attempt to flee, but, instead, complied with the Agents's orders while trying to provide them with his identification.   Although the Agents disagree with Jones's conclusion, the parties agree on two of the *Graham* factors, and they appear to partially agree on a third factor.   Specifically, the Agents do not dispute that Jones did not resist or attempt to flee, nor do they dispute that Jones was stopped for speeding.   And the Agents and Jones partially agree that he did not pose an immediate threat of safety to the Agents or the public.   They diverge, however, on the point in time when this conclusion was known or should have been known by the Agents.   And it is this disagreement that

the Court finds dispositive to the qualified immunity analysis.

As *Graham* recognizes, the "'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene"—"rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).  Jones's theory is that he was never a threat to the Agents or the public because he was a Sargent with the Sheriff's Office and was assisting other law enforcement agencies in the aftermath of Hurricane Irma.  But the Agents could not know this until they confirmed Jones's identity and his law enforcement credentials.  And at that snapshot in time, based on Jones's allegations, this is what the Agents experienced: that after initiating a stop, an unidentified man immediately exited his unmarked truck in plain clothes and, as he started approaching the Agents, intimated that he was going to reach for his wallet.  (*See* D.E. 25 at ¶¶ 16, 25–26, 28–29.)

As a Sargent with the Sheriff's Office, Jones likely knows and appreciates that "a police officer need not credit everything a suspect tells him." *Rodriguez v. Farrell*, 294 F.3d 1276, 1278 (11th Cir. 2002).  So while Jones initially announced to the Agents that he worked for the Sheriff's Office—an announcement made only *after* he exited his unmarked vehicle in plain clothes and began approaching the Agents—and then repeated this throughout the encounter, the Agents were not forbidden from exercising force in order to confirm Jones's assertion.  The same is true about Jones intimating that he was going to reach for his wallet to provide his identification.  And this is because officers conducting an investigative stop "may take reasonable steps to ensure their safety so long as they possess an articulable and objectively reasonable belief that the suspect is potentially dangerous." *United States v. Mendoza*, 658 F. App'x 479, 484 (11th Cir. 2016) (quoting *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004)).  Faced with this situation, no prudent officer would have just taken Jones at his word at the potential sacrifice of his safety.

Looking at the *Graham* factors together, the Court finds that although Jones was stopped for a minor, non-criminal offense and did not resist or attempt to flee—two factors that certainly weigh in Jones's favor—the dynamic of the whole encounter changed irreversibly when Jones exited his unmarked truck in plain clothes and, as he started approaching the Agents, intimated that he was going to reach for his wallet. Confronted with this situation, the Agents acted lawfully by exercising force to verify Jones's identity and law enforcement credentials, and to determine whether he posed a threat to them or the public.

### (ii) The Eleventh Circuit's Additional Factors

The Eleventh Circuit adds other important considerations to the qualified immunity calculus, such as "the relationship between the need and amount of force used" and "the extent of the injury inflicted." *Sebastian*, 918 F.3d at 1308 (quoting *Vinyard*, 311 F.3d at 1347).

Starting with the amount of force, the Agents argue that the force used against Jones was *de minimis*. Jones disagrees. He emphasizes that he immediately felt pain and his shoulder muscle and tendons tear right when his arm was pulled behind his back and to the middle of his neck by Agent Arias. While Jones initially asserted in the Amended Complaint that this maneuver was an "objectively unreasonable, unwarranted, impermissible, unconstitutional[,] and gratuitous excessive force," (D.E. 25 at ¶ 43), he now acknowledges in his Opposition that "lifting an arrestee's arm behind his back in order to handcuff him is a routine arrest technique" (D.E. 27 at 12). And indeed, the Eleventh Circuit has ruled that the arm pinning maneuver used on Jones is "a relatively common and ordinarily accepted non-excessive way to detain an arrestee." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir. 2002) (officer "grabbed plaintiff's arm, twisted it around plaintiff's back, jerk[ed] it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that [the officer] was hurting him"); *see also Huebner v. Bradshaw*, 935 F.3d

1183, 1191 (11th Cir. 2019) ("Officers routinely pull arrestees' arms behind their backs . . . .").

Although Jones does not take issue in his Opposition with being "grabbed" and "slammed" against the fender and hood of the Suburban, there is no question that "[t]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Hall v. Ala. Dept. of Pub. Safety*, 249 F. App'x 749, 751 n.1 (11th Cir. 2007) (quoting *Vinyard*, 311 F.3d at 1347). And even when taken together, the arm pin and the body grab and slam fall well short of the even harsher exercises of force that have not been enough to sustain excessive force claims. *See, e.g.*, *Croom v. Balkwill*, 645 F.3d 1240, 1244–45, 1252–53 (11th Cir. 2011) (*per curiam*) (affirming summary judgment for officers and finding no excessive force where an officer pushed a 63-year-old retired woman with arthritis "to the ground from her squatting position and [held] her there with a foot (or knee) in the back for up to ten minutes"); *Rodriguez*, 280 F.3d at 1351 (reversing denial of qualified immunity and ruling there was no excessive force where officer "grabbed plaintiff's arm, twisted it around plaintiff's back, jerk[ed] it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that [the officer] was hurting him"); *Nolin v. Isbell*, 207 F.3d 1253, 1254–55, 1258–59 (11th Cir. 2000) (reversing denial of qualified immunity where officer grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and [then] handcuffed him"); *Jones v. City of Dothan, Ala.*, 121 F.3d 1456, 1458 1460– 61 (11th Cir. 1997) (*per curiam*) (reversing denial of qualified immunity where the officer "slammed" the plaintiff "against a wall, kicked his legs apart, [and] required him to raise his arms above his head" causing the plaintiff to experience "pain from having to lift his arms since he had previously suffered a stroke" and "pain in his arthritic knee from having his legs kicked apart").

Looking to the severity of his injury, Jones emphasizes that he felt tears in his shoulder muscle and tendons immediately when Agent Arias performed the arm pinning maneuver, which ultimately resulted in "significant medical treatment." (D.E. 25 at ¶¶ 35, 43.) But "the severity of the injury alone does not transform" the Agents's use of force into an excessive use. *See Sanchez v. Obando-Echeverry*, 716 F. Supp. 2d 1195, 1207 (S.D. Fla. 2010). And beyond these allegations, the Amended Complaint is silent on the extent of Jones's injuries and treatment. At any rate, the denial of qualified immunity has been reversed even in cases where the officer's force resulted in "more than twenty-five subsequent surgeries and ultimately amputation of the arm below the elbow." *See Rodriguez*, 280 F.3d at 1351.

Turning to the need for force, Jones argues that he was subjected to gratuitous force. He is correct that the Eleventh Circuit has "repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands." *Sebastian*, 918 F.3d at 1308 (quoting *Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 (11th Cir. 2017)). But that is not what Jones alleges here. To start, Jones never alleges that he was handcuffed. And so his reliance on *Lee v. Ferraro* and *Hadley v. Gutierrez* stretches beyond persuasion. *See Lee*, 284 F.3d at 1199 (suspect's head was slammed onto a trunk *after* the suspect was "arrested, handcuffed, and completely secured, and after any danger to the arresting officer as well as any risk of flight had passed"); *Hadley*, 526 F.3d 1324, 1330 (11th Cir. 2008) (suspect was punched in the stomach *after* "he was handcuffed and not struggling or resisting"). Jones also never alleges that he was subjected to additional force after the Agents confirmed his identity, as he was subsequently released. And so, the force used against Jones lasted no longer than necessary to confirm or dispel the Agents's suspicions. *Cf. Thompson v. Hall*, 479 F. App'x 243, 245 (11th Cir. 2012) (affirming

denial of qualified immunity where "the length and circumstances of [the plaintiff's] detention were not 'reasonably related in scope to the circumstances which justified' the initial decision to handcuff her" because she "remained handcuffed for at least an hour, well after the scene had been secured") (citation omitted).

Jones's gratuitous force argument, then, is not supported by his allegations. And by extension, his reliance on *Stephens v. DeGiovanni* and *Smith v. Mattox* is misplaced because the force used in those cases was far and away more oppressive than the force used here. *See Stephens*, 852 F.3d at 1322–24 (reversing summary judgment for officer where the officer struck the plaintiff in his chest multiple times, causing his head to strike the door jamb, stepped on the plaintiff's foot while slamming him into a car, and twisted the plaintiff's right hand back toward his forearm such that the plaintiff's full body weight was supported by only three of his fingers); *Smith*, 127 F.3d 1416, 1418 (11th Cir. 1997) (affirming denial of qualified immunity where officer put his knee into the plaintiff's lower back to prepare an arrest and in the process of pulling the plaintiff's left arm behind his back, put the plaintiff's forearm in a position that caused discomfort and then, "with a grunt and a blow," broke the plaintiff's arm).

Together, the Eleventh Circuit's additional factors do not alter the conclusion reached under the *Graham* factors. Although Jones was stopped for a minimal, non-criminal infraction and did not resist or attempt to flee, the Court cannot "use hindsight to judge" the Agents's use of force. *Rodriguez*, 280 F.3d at 1352–53. Instead, the Court must look at what the Agents "knew (or reasonably should have known) at the time of the act." *Id.* at 1353. And at that time, all the Agents knew was what they observed: that after initiating a stop, an unidentified man immediately exited his unmarked truck in plain clothes and, as he started approaching them, intimated that he was going to reach for his wallet. In this moment, the Agents did not know Jones's name or his

occupation; nor, most importantly, his intentions. And so they acted lawfully by using force to determine Jones's identity and to assess whether he posed a threat to the Agents or the public. In doing so, the Agents were not plainly incompetent and did not knowingly violate the law. *Cf. Corbitt*, 929 F.3d at 1323 (reversing denial of qualified immunity at motion to dismiss stage even where officer fired his gun at a dog and accidentally shot a 10-year-old child in the knee).

On the facts alleged, the Court finds that Jones does not meet his burden of establishing that the Agents violated his Fourth Amendment rights. *Sebastian*, 918 F.3d at 1308 ("[Q]ualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the officer's] position to conclude the force was unlawful.") (citation omitted). The Agents are thus entitled to qualified immunity. *Diaz*, 424 F. Supp. 3d at 1356 ("[U]nless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of the discovery.") (citation omitted).

### d) "Clearly Established" Right

The Court finds that Jones does not allege a constitutional violation here. And without this element, the Court "need not assess whether the alleged violation was clearly established." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1170 (11th Cir. 2009) (citing *Case v. Eslinger*, 555 F.3d 1317, 1328 (11th Cir. 2009)); *Varnadore*, 778 F. App'x at 813 ("Because we conclude that Merritt did not violate Foskey's Fourth Amendment rights in this case, it necessarily follows that there was no violation of a clearly established right."). That said, even if Jones sufficiently alleged a constitutional violation, he would still fail to meet his burden of showing that qualified immunity is not appropriate because his allegations are not defined with the specificity required for this Court to rule that the Agents violated a clearly established right.

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at

a high level of generality." *City of Escondido v. Emmons*, — U.S. —, 139 S. Ct. 500, 503 (2019)

(*per curiam*) (quoting *Kisela v. Hughes*, — U.S. —, 138 S. Ct. 1148, 1152 (2018) (*per curiam*)).

This is "particularly important in excessive force cases" because "it is sometimes difficult for an

officer to determine how the relevant legal doctrine . . . will apply to the factual situation the

officer confronts." *Id.* (quoting *Kisela*, 138 S. Ct. at 1152). And because excessive force is "an

area of the law in which the result depends very much on the facts of each case . . . police officers

are entitled to qualified immunity unless existing precedent *squarely governs the specific facts at*

*issue*. . . ." *Id.* (emphasis added) (quoting *Kisela*, 138 S. Ct. at 1153). And so, "it does not suffice"

for this Court to simply state that the Agents "may not use unreasonable and excessive force, deny

qualified immunity, and then remit the case for a trial on the question of reasonableness." *Id.*

(quoting *Kisela*, 138 S. Ct. at 1153).

      Here, Jones only alleges that he had a "clearly established Constitutional right under the

Fourth Amendment to be secure in his person from unreasonable seizure through excessive force"

and that any reasonable officer would know that this right was clearly established at the time.

(D.E. 25 at ¶¶ 74–75, 91–92.) And then he summarily, and passively, argues that he has shown

that "[i]t is clearly established that an arrest made or instituted without probable cause violates the

Fourth Amendment." (D.E. 27 at 8.) But these general allegations, taken as true and left without

any further elaboration, are framed at the same "high level of generality" that the Supreme Court

has scolded courts for using as grounds to deny qualified immunity. *See City of Escondido*, 139

S. Ct. at 503 (reversing court of appeals for "defin[ing] the clearly established right at a high level

of generality by saying only that the 'right to be free of excessive force' was clearly established");

*Kisela*, 138 S. Ct. at 1152 (reversing denial of qualified immunity and noting that it has "repeatedly

told courts . . . not to define clearly established law at a high level of generality")

(citation omitted); *see also Corbitt*, 929 F.3d at 1316 (reversing denial of qualified immunity at motion to dismiss stage where district court erred in "relying on the general proposition that it is clearly established that the use of excessive force is unconstitutional"). So even if Jones sufficiently alleged a constitutional violation—and he does not—his allegations are not defined with the specificity required for this Court to deny qualified immunity.

The Court does not doubt that with the benefit of hindsight all parties could have acted more carefully. But qualified immunity is evaluated under a calculus that must consider—as Jones can appreciate—that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Corbitt*, 929 F.3d at 1321–23 (reversing denial of qualified immunity even where officer fired his gun at a dog and accidentally shot a 10-year-old child in the knee) (citation omitted).

And taking Jones's allegations as true, the Court finds that not every officer in the position of the Agents would conclude that the force used against Jones was unlawful. *Sebastian*, 918 F.3d at 1308 ("[Q]ualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the officer's] position to conclude the force was unlawful.") (citation omitted). As such, for all these reasons, the Agents are entitled to qualified immunity on the *Bivens* claims. Counts 5 and 6 are thus **DISMISSED** as barred by qualified immunity.

### 2. Section 1983 Claims (Counts 7–8)

Finally, Jones asserts Section 1983 claims against both Agents. The Agents argue that these claims must be dismissed because alleged wrongdoing by federal actors cannot support Section 1983 claims. Jones persists that he alleges colorable claims under Section 1983.

But the Court need not address these arguments because "the qualified immunity analysis is identical" under both *Bivens* and Section 1983. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999).

And as shown above, Jones fails to meet his burden of establishing that the Agents violated his Fourth Amendment rights.  And he also fails to define that violation with the specificity required for this Court to rule that the Agents violated a clearly established right.  The Court thus finds that the Agents are also entitled to qualified immunity on the Section 1983 claims.  Counts 7 and 8 are therefore also **DISMISSED** as barred by qualified immunity.[6]

## CONCLUSION

For all these reasons, it is

**ADJUDGED** that Defendants' Motion to Dismiss **(D.E. 26)** is **GRANTED IN PART AND DENIED IN PART** as follows:

(1) As to the claims against the United States, Count 1 is **DISMISSED** for failing to state a claim, and Counts 2 and 3 are **DISMISSED** as subsumed by Count 4. The United States must answer the only remaining claim, Count 4, **no later than September 18, 2020**;

(2) As to the claims against the Agents, Counts 5–8 are **DISMISSED** as barred by qualified immunity, and Counts 9 and 10 are **DISMISSED** as duplicative; and, finally

(3) The stay of discovery **(D.E. 31)** is **LIFTED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this ___ of August 2020.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE.

Copies furnished to:

Counsel of Record

---

[6] And in any event, Section 1983 "does not apply to federal actors acting under color of federal law." *Hindman v. Healy*, 278 F. App'x 893, 895 (11th Cir. 2008) (citing *Dist. of Columbia v. Carter*, 409 U.S. 418, 424–25 (1973)); *Albajon v. Gugliotta*, 72 F. Supp. 2d 1362, 1370 (S.D. Fla. 1999) (granting summary judgment to federal officer on Section 1983 claim because her "authority [arose] solely from her status as a federal law enforcement officer as a Special Agent of the United States Drug Enforcement Administration" and so "[a]ny actions taken by [the agent] in this matter arose under federal law").